**In re Irma Frances CARMACK, Debtor.**

**Bankruptcy No. 87–04702–C–12.**

United States Bankruptcy Court,
W.D. Missouri, C.D.

March 21, 1988.

Gwendolyn Froeschner, Columbia, Mo., for debtor.

Jerry W. Venters, Jefferson City, Mo., for Tri–County Bank.

### MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

Debtor filed her petition under Chapter 12 of the Bankruptcy Code on November 2, 1987. Debtor filed a Motion To Determine Secured Status on January 28, 1988. Tri County Trust Company (Bank) filed its response and debtor's Motion was heard. Debtor had ten notes with the Bank. Three of those notes are what the parties called "collateral notes" in that the Bank agreed to lend up to the face amount of each note to the debtor at a later date and debtor pledged collateral to secure the payment of any sums later advanced on said notes. In other words these three loans were for the purpose of obtaining a revolving line of credit for the use of the debtor to use in her farming operation. The first of these three was dated 9–4–81 for a limit of $200,000.00; the second was dated 5–3–

85 for a limit of $70,000.00; and the third was dated 4–11–86 for a limit of $157,000.00. All three had different collateral as security for each one. Debtor then had five loans evidenced by her notes; one note cosigned by her son; and one automobile loan. Debtor owed $206,115.16 on her notes and $39,954.59 on the cosigned note. All of the notes executed by debtor except the "car" note are in question with the question being whether said notes are secured vel non.

Debtor and her late husband signed only the first collateral note. He died shortly thereafter. All documents after his death in January of 1983 were signed only by debtor except for the cosigned note. Although the Bank would lead the Court to believe that debtor was a steely-eyed and hard bargaining borrower of considerable experience, the Court believes that debtor had been a working farm wife and still remains somewhat naive as to the "ways of lending officers" and how they come and go. One example of the naivete on the one hand and the ways of the Bank on the other hand will be set out later in regard to the "car" loan.

The first note in question was dated March 28, 1983 in the amount of $164,000.00, signed by debtor, and stated on its face that it is secured by certain personal property and a collateral loan dated 3–4–81. Careful readers will note that this author never mentioned a 3–4–81 collateral form note. The Bank also noted this, albeit at a substantially later date, and the numbers 3–4–81 had been marked out and the numbers 9–4–81 typed in and initialed "VLR". In connection with the personal property, the Bank had a UCC–1 filed May 14, 1981, and a continuation statement (UCC–3) filed May 21, 1986. Blank 3 (Optional: Maturity Date) was indeed not filled in on the May 14, 1981 UCC–1.

The second note in question was dated March 28, 1983, in the amount of $46,500.00. It was co-signed by debtor and her son. It stated on its face that it was secured by a collateral loan dated 3–4–81. Again those figures had been struck out

and the figures 9–4–81 had been typed in and the initials "VLR" added.

The third note in question was dated November 14, 1983 in the amount of $23,000.00, and stated on its face that it was secured by a collateral loan dated 3–4–81. Once again those figures had been struck out, the figures 9–4–81 typed in and the initials "VLR" added.

The fourth note in question was dated April 23, 1985, in the amount of $23,000.00. It stated on its face that it was secured by "Collateral Loans dated 3–4–81 and ...". Later the figures 3–4–81 were struck out, the figures 9–4–81 typed in, the figures 5–3–85 added after the word "and", and the initials "VLR" added.

The fifth note in question was dated April 23, 1986 in the amount of $24,269.22, and stated that it was secured by a deed of trust dated April 23, 1986. Once again careful readers will recall there was no collateral form note of such date. Nor in all the exhibits introduced was there any such deed of trust. The three deeds of trust held by the Bank were dated 9–4–81 (recorded 9–10–87); 5–3–85 (recorded 5–7–85); and 4–11–86 (recorded 5–1–86).

The sixth note in question was dated September 8, 1986 in the amount of $35,000.00. The wording on it is more complex. It stated: "this note is also secured by a D/Tr dated 4–11–86". Beneath that legend it further stated: "this note is secured by a Collateral Loan dated 3–4–81 between Irma Carmack and Tri–County Trust Company". As to the latter portion of the legend, once again the figures 3–4–81 have been struck out and the figures 9–4–81 typed in, and the initials "VLR" added.

The above facts as to the appearance of the notes, the changes in the collateral, the addition of a date, and the respective dates of the notes and deeds of trust are not disputed. Nor in dispute is the testimony of Virgil L. Rennie, an officer of the Bank. He testified that some point in time prior to the filing of the bankruptcy (even the approximate date of which he was unable to identify) he discovered the error in the notes. He caused the 3–4–81 dates to be struck out on notes first, second, third,

fourth and sixth above and caused the dates 9–4–81 to be typed on said notes in substitution. He further testified that at an even later date, which was after the date the bankruptcy petition was filed, he discovered the blank date on note fourth above, and filled in that date as 5–3–85. The initials "VLR" were his. It appears that he never noticed that there was not a collateral loan dated April 23, 1986, or deed of trust of that date.

Based on the foregoing, the debtor contends that the debts to the Bank are unsecured. Although counsel for the debtor did not specifically request it, it is apparent that debtor would have no objection to this Court rising up in wrath and smiting down the entire debt to the Bank on the notes denominated first, second, third, fourth and sixth above under the theory of R.S.Mo. 400.3–407. Under that Section of the Uniform Commercial Code as adopted by Missouri, the Court could find that the alteration was material and once finding that the alteration was material, could proceed to find that the alteration was also fraudulent, and that the debtor was discharged on the altered notes. As the Supreme Court of the State of Missouri stated in *Dodd v. Tucker*, 156 S.W.2d 901:

> "Any material alteration of an instrument, after the execution thereof, intentionally caused directly or indirectly by the owner or holder thereof, ... without the consent of the party sought to be charged thereon, renders it void as between such non-consenting parties and the person responsible for the alteration ..." (l.c. 902).

To like import, see the decision of the Supreme Court of Missouri in a case entitled *First National Bank of Fredonia v. Meadows*, 460 S.W.2d 604. However, these precode cases have been ameliorated somewhat by cases under the Uniform Commercial Code, and it is not the intent of the Court to construe or rule upon R.S.Mo. 400.3–407 in holding the debts to be unsecured since the Court has been requested only to rule the question of secured status and a ruling on this issue is not necessary to the result reached. Nevertheless, the Court would be remiss in not suggesting the possible penalty that any holder of commercial paper may fall victim to when it unilaterally and nonconsensually alters the terms thereof. Needless to say, the Court views such activity with a substantial degree of concern.

The Bank, of course, argues that changing the dates was not a material alteration and merely a minor correction to reflect the real agreement of the parties. The Bank postulates that debtor knew the notes were secured by the "collateral loan" deeds of trust and that correction of the clerical errors merely reflected the true intent of the parties. *In re Blieden*, 49 B.R. 386 (W.D.Ky.1985) and other cases cited by the Bank support this view. See also *St. Louis 221 Club v. Melbourne Hotel Corp.*, 227 S.W.2d 764, 768 (Mo.App.1950), wherein the Court said:

> "Courts of equity have from time immemorial exercised power to reform written instruments so as to make them speak the real agreements made between the parties in cases in which by the mistake or misprision of the scrivener the writing fails to do so, and will exercise this power not only as between the original parties, but as to those claiming under them in privity, such as personal representatives, heirs, assigns, grantees, judgment creditors, or purchasers from them with notice of the facts". (citations omitted).

■ The pivotal point in this case which makes it unnecessary for the Court to determine if the notes have been voided by the unilateral activities of the Bank is not the intent of the parties but the time element of the alteration. The Bank's evidence did not establish that the alterations occurred more than ninety days prior to the filing of the petition under Chapter 12. In fact, the only even slightly definite evidence as to the time element, established that the 5–3–85 date was filled in after the bankruptcy filing date. There was absolutely no evidence as to when the 3–4–81 dates were changed to 9–4–81 or even any estimates of that date. The Court has to conclude that the alteration occurred after September 8, 1986, which was the last date that debtor obtained an advance from the

Bank. Otherwise it would seem only logical to have the debtor also initial the alterations as she was getting the last $35,000.00 from the Bank. Debtor testified that every time she needed money, she went to the Bank, that the Bank prepared whatever papers it required, and that she was always told that she had to sign whatever they presented her to obtain the desired funds. The Bank testified that every transaction was explained to debtor in detail and that she did (or should have) fully understood the details of each transaction.

Based on the evidence before the Court, the Court finds that the debtor's version is more believable, and the Court does believe the debtor. Thus, if the Bank had discovered the errors before debtor's last loan, all the Bank would have needed to do was tell the debtor to initial the corrections and debtor would have done so. This did not occur and since there was no triggering event that the Bank testified to between that date and the date of the filing it seems very likely that the alteration occurred quite close to the latter event when the Bank and the debtor were having the problems that almost always presage the filing for relief.

■ If the alteration occurred within ninety days of the filing, then the Bank altered its position from unsecured to secured within ninety days of bankruptcy, thus clearly creating a preference. *Deel Rent–A–Car, Inc. v. Levine,* 16 B.R. 873 (S.D.Fla.1982) Furthermore, the antagonists in this matter change from the Bank versus the debtor to the Bank versus the debtor in possession and the Trustee at a point in time beginning ninety days before the filing of the petition. The Trustee (or the debtor in possession) occupies a far different position than the debtor alone did. The cases are legion that a creditor which has made an error in its security documents cannot improve its position within the ninety day framework to defeat the position of a Trustee or a debtor in possession position as:

"(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists".

To allow these alterations effect without proof that they were made more than ninety days prior to the filing of the petition would be an egregious blunder in view of 11 U.S.C. § 544. Therefore, this Court has no alternative but to declare those loans on which the dates were changed or added to be unsecured by the collateral notes to which they now refer. This leaves the notes denominated as fifth and sixth above. What secures the fifth? The answer is nothing unless the Bank can produce a note and lien creating instrument, properly perfected, that bears the date April 23, 1986. As to the note denominated sixth (dated 9–8–86) it is secured by the note and deed of trust dated April 11, 1986.

■ Returning to the notes allegedly secured also by the personal property, they also must be determined to be unsecured by that collateral, and the Court so rules. Although the personal property security is only mentioned herein in connection with the first note, certain other notes indicated they also were secured by personal property. The reasons for the Court's ruling as to this alleged collateral are far different. The first financing statement or UCC–1 was filed with the Recorder of Deeds on May 14, 1981. No maturity date was stated. No other UCC–1's were shown filed by the evidence. Therefore, under R.S.Mo.

400.9–403 the perfection of the Bank's security interest afforded by the May 14, 1981 filing expired on May 13, 1986. To continue perfection of the Bank's security interest beyond that date one of two events had to occur:

1. The Bank filed a continuation statement within six months before the expiration date; or

2. The Bank filed a new financing statement executed by the debtor.

The sixty day grace period after expiration permitted for the filing of a continuation statement only applies to UCC–1's which contain a stated maturity date. The Bank's UCC–1 did not. Therefore, the Bank could not file a valid continuation without the debtor's signature, on any date after May 13, 1986, and the May 21, 1986 filing can only be attributed to clerical error in the Office of the Recorder of Deeds of Howard County, Mo. That office should neither have accepted same nor filed it of record. The fact that it did does not change the legal position of the parties. Thus the personal property is not security for any of the debtor's notes as far as the debtor in possession and the Trustee are concerned, nor has it been such either as to them or to any other third party since May 14, 1986.

The result the Court has reached may be considered harsh by some and is based in part upon the Court's findings as to truthfulness of the witnesses. Perhaps an example of the conduct of the Bank in regard to the "car" loan will illustrate why the Court has some concerns about the testimony of the Bank's officers in regard to the other events to which they testified. On December 23, 1985, the debtor traded in her old car and purchased a 1985 Ford LTD. The Bank loaned her $7,715.00 and set this consumer loan up on a 50 month repayment schedule of $200.00 per month. The Bank furnished a coupon book to the debtor. Each month the debtor sent her check for $200.00 to the Bank along with a coupon from the coupon book. The debtor also paid $2,000.00 on this loan to the Bank on February 18, 1986 and $3,000.00 on this loan to the Bank on March 3, 1986. On May 13, 1987, when debtor sent in her $200.00 check and the coupon on the car loan, her balance was less than $101.00, and the Bank, after application of her May check, showed a $99.00 credit balance. The Bank did not notify the debtor that the loan was paid. The Bank did not send the debtor the title to the motor vehicle. The Bank instead applied the credit balance to debtor's April 23, 1986 loan *and* applied debtor's next five $200.00 payments to that same loan. It was only after debtor filed bankruptcy that the Bank returned her November check for $200.00 and released the lien on her title.

The Court recognizes that a creditor who receives a payment not designated as to application by debtor may apply it as the creditor wishes. *Anchor Lumber Co. v. United Exteriors, Inc.,* 604 S.W.2d 754, 757 (Mo.App.1980) The Court also recognizes that a debtor may designate which of several debts the debtor wishes any payment to be applied. *Id.* The Court cannot conceive how there could be much clearer indication of the debtor's designation of her payments to the "car" loan than sending the precise amount of the monthly payment due on that loan together with a coupon from the coupon book furnished by the Bank for use each month. Such conduct on the part of the debtor and the Bank tends to negate the image of the debtor as a shrewd and understanding borrower as well as the image of the Bank as a character study in rectitude and assistance, always explaining to debtor what she was signing and what its effect was. In fact, the Court is convinced that debtor signed what she was told to sign, paid what she was told to pay (as best she could) and relied on her "friendly bank" to treat her appropriately, honestly and in consonance with good banking practice.

Based on the foregoing, the Court rules that all of the loans of debtor to the Bank except for the note dated September 8, 1986 are unsecured and may be treated as such by the debtor in her Chapter 12 proceeding. The September 8, 1986 note is ruled to be secured as stated above.

This Opinion constitutes Findings of Fact and Conclusions of Law as required by Rule 7052, Rules of Bankruptcy.