In re **Irma Frances CARMACK, Debtor.**

**Irma Frances CARMACK,**
**Movant/Appellee,**

v.

**TRI–COUNTY TRUST COMPANY,**
**Respondent/Appellant.**

No. 88–4157–CV–C–T.
Bankruptcy No. 87–04702–C–12.

United States District Court,
W.D. Missouri, C.D.

Sept. 29, 1988.

Gwendolyn S. Froeschner, Columbia, Mo., for Carmack.

Jerry Venters, Jefferson City, Mo., for respondent/appellant.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Pending before the Court is an appeal of an order and judgment of the Bankruptcy Court.[1] The primary issue in this Chapter 12 Bankruptcy appeal involves the attempt by the trustee (debtor-in-possession) to set aside allegedly preferential transfers created when the appellant Tri–County Trust Company (hereinafter Tri–County) unilaterally altered references to preexisting collateral agreements in future advance promis-

---

**1.** The Honorable Frank W. Koger, United States Bankruptcy Judge for the Western District of Missouri.

sory notes. The Bankruptcy Court released all real estate mortgages securing the altered notes as preferential transfers. The effect of the holding was to render the great majority of the notes unsecured. The Court also set aside Tri–County's liens on the personal property of the debtor because Tri–County failed to file a UCC Continuation Statement to maintain its priority. This Court affirms the Bankruptcy Court's decision with respect to the personal property of the debtor, but reverses it as to the mortgages on debtor's land and remands for proceedings consistent with this order.

## Factual Background

This case originated with the filing of a Motion to Determine Secured Status of certain promissory notes held by Tri–County. The debtor challenged Tri–County's mortgages securing said notes on the grounds that they constituted preferential transfers in violation of 11 U.S.C. § 547 (1979). The facts are set forth in the Bankruptcy Court's opinion[2] and need only be briefly mentioned here.

Mrs. Carmack (hereinafter "the debtor") and Tri–County had been doing business for ten years before the first note at issue here was executed in 1981. The record does not reflect any problems between the parties during this time. In late 1981, the debtor and her husband[3] entered into an agreement whereby they could secure a line of credit for debt service and operating expenses incurred in their farming operation. The transaction was structured as follows: A deed of trust, collateral note and promissory note were executed on September 4, 1981 (hereinafter "Collateral Agreement A"). The deed of trust covered the debtor's homestead as well as an additional parcel of land referred to by the debtors as the "Bryant" place. The promissory note had a face value of $200,000.

No money changed hands with the execution of these instruments as Collateral Agreement A was to cover future ad-

vances. The debtor would, as needed, execute her promissory notes for funds to operate the farm. A total of four promissory notes were executed pursuant to Collateral Agreement A: Note 1 was executed on March 28, 1983, in the amount of $164,-000; Note 2 was executed in March of 1983 in the amount of $46,500; Note 3 was executed on November 14, 1983 in the amount of $30,000; Note 4 was executed on April 25, 1985 in the amount of $27,000.

Although all appeared in order with respect to the transactions, a problem was concealed in the paperwork. Notes 1 through 4 inclusive stated that they were "secured by a collateral agreement of 3–4–81." No such collateral agreement existed at the time of execution or at any time subsequent. The execution date of Collateral Agreement A was 9–4–81.

New financial need of the debtor necessitated the execution of a second collateral agreement to cover additional advances. On May 3, 1985, a new deed of trust, collateral note and promissory note were executed (hereinafter "Collateral Agreement B"). The deed of trust covered real estate designated by the debtor as the "Thurman" and "Bryant" farms. The face value of the note was $157,000. Again, no money changed hands; it was disbursed to the debtor as needed.

A promissory note dated April 25, 1986 (note 5) remained unsatisfied at the date of filing. Note 5 stated it was secured by "a collateral agreement of 3–4–81 and _____." The blank contained the handwritten date "5/3/85". It was undisputed at the hearing that this date was inserted *after* the execution of the agreement and without first notifying the debtor. Note 5 also contained the erroneous reference date "3/4/81".

The final collateral note was executed on April 11, 1986 (hereinafter "Collateral Agreement C"). The promissory note reflected a face value of $157,000 and was

---

**2.** *In Re Carmack,* 84 B.R. 625 (Bankr.W.D.Mo. 1988).

**3.** The debtor's husband passed away following the execution of the first collateral note. The

remaining collateral notes and promissory notes were executed by the debtor individually or with her son, Kenneth Carmack.

secured by the "Saline County" farm. Two notes relate to Collateral Agreement C. Note 6 has a face value of $24,269.22 and states it is secured by a "Collateral Agreement of 4/11/86." Note 7 has a face value of $35,000 and states it is secured by a "Collateral Agreement of 4/11/86 and 3/4/81." Obviously, Note 7 shares the problem of its predecessors.

Some time after the execution of Note 7, Tri–County discovered the date reference errors contained in Notes 1, 2, 3, 4, 5 and 7. Mr. Renne, a Tri–County Vice–President, unilaterally and without the debtor's permission, marked through all the "3–4–81" dates and replaced them with "9–4–81"— the execution date of Collateral Agreement A. Mr. Renne's initials ("VLR") were also present next to each alteration. The blank in note 5 was also filled in with "5/3/85" at this time. Mr. Renne testified to the effect that his intent in making the changes was to correct a clerical error and make the notes accurately reflect the original intent of the parties.

The debtor's testimony revealed a relatively unsophisticated borrower. Nevertheless, the debtor testified she understood the notes she was signing were secured by her various properties and that Tri–County could take and sell her land if she did not make her payments. Further, she understood the nature of her liability for any deficiency arising from a foreclosure. Although she did not recognize it by name, the debtor also understood the nature of future advance financing. While the debtor is by no means an expert on this type of transaction, she has a basic understanding of the obligations and their import. The debtor testified she was never notified of Mr. Renne's intention to alter the promissory notes. Mr. Renne admits he never consulted the debtor about the alterations.

Bank Officers Himmelberg and Fuemmler testified that they counseled the debtor as to the nature of her obligations to the bank whenever she signed documents. While such testimony must be taken with a grain of salt, the evidence on the whole supports a conclusion that some counseling did take place and it was effective enough to give the debtor a general understanding of the transactions outlined above.

The Bankruptcy Court filed its Findings of Fact and Conclusions of Law on March 21, 1988. The Court found that, at the time Mr. Renne changed the aforementioned note to reflect the "9–4–81" execution date of Collateral Agreement A and filled in the blank contained in Note 5 with the date "5–3–85", Tri–County did not have a mortgage securing the notes because the notes did not reference an existing Collateral Agreement. The Court concluded that after Mr. Renne changed the dates Tri–County did have a mortgage securing the notes because the reference date was now correct. Accordingly, as the Court found the alterations occurred within the presumed 90–day preference period, the Court voided the mortgages securing all the notes with the exception of note 6; said note being the only note accurately reflecting an existing Collateral agreement at the time of execution.

This appeal followed.

### Analysis

Appellant raises two issues on its appeal of the lower court's judgment: (1) appellant contends the Bankruptcy Court erred in finding the unilateral changes to the dates on the promissory notes were "transfers" so as to constitute a preference in violation of 11 U.S.C. § 547; (2) appellant contends the hearing court erred in improperly allocating the burden of proof on the issue of when the transfer, if any, occurred. The appellant's first assignment of error is dispositive here and renders the Court's attention to the second unnecessary.

Initially, the Court notes "the Bankruptcy Court's findings of fact are not to be overturned unless clearly erroneous; however, its conclusions of law are subject to *de novo* review." *In Re Martin,* 761 F.2d 472, 474 (8th Cir.1985) (*citing In Re Comer,* 723 F.2d 737, 739 (9th Cir.1984)).

The Code section relevant to preferential transfers is 11 U.S.C. § 547 (1979). Section 547, in pertinent part, provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any *transfer* of property of the debtor—

    (1) to or for the benefit of a creditor;

    (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3) made while the debtor was insolvent;

    (4) made—

        (A) on or within 90 days before the filing of the petition;

        \*    \*    \*    \*    \*    \*

    (5) that enables such creditor to receive more than such creditor would receive if—

        (A) the case was under Chapter 7 of this title;

        (B) the transfer had not been made;

        (C) such creditor received payment of such debt to the extent provided by the provision of this title ...

11 U.S.C. § 547(b) (1979 & Supp.1988) (emphasis added).

The only issue before this Court is whether a unilateral alteration to a collateral reference date constitutes a "transfer" as that word is defined in Section 547. A review of the relevant law on this issue and the facts of this case convinces the undersigned it does not.

11 U.S.C. § 101(50) defines "transfer" as follows:

"Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title, as a security interest and foreclosure of the debtor's equity of redemption.

11 U.S.C. § 101(50) (Supp.1988).

There is no dispute that the term "transfer" is to be interpreted broadly. In this vein, it has been held that the taking of any interest in the debtor's property, including a mortage on the debtor's land for antecedent debt, will constitute a "transfer" for purposes of Section 547. *See e.g. Matter of Steele,* 27 B.R. 474, 478 (Bankr.W.D.Wis.

1983); *In Re Caudy Custom Builders, Inc.,* 31 B.R. 6, 8 (Bank.D.S.C.1983) (recording of mortgage is transfer for § 547(b) purposes); *In Re Lyon,* 35 B.R. 759, 761 (Bankr.D.Kan.1982).

As previously outlined, the Bankruptcy Court necessarily reached two conclusions in support of its decision that a mortgage (and accordingly a transfer) was created within the preference period. First, the Court concluded no valid mortgage existed when the reference dates were altered. Second, the Court concluded that the unilateral actions of Tri–County created a mortgage and, accordingly, a preference. *In Re Carmack,* 84 B.R. 625, 628 (Bankr. W.D.Mo.1988). The undersigned respectfully disagrees with both conclusions.

First, the Court believes Tri–County did have a valid mortgage securing the notes at issue here pursuant to Collateral Agreement A and B. This conclusion is based on one finding—it was the intent of the parties.[4]

It is axiomatic that a contract is interpreted by the intent of the parties rather than the literal interpretation of the written word. A contract denominated as a promissory note or deed of trust is no exception. *See Matter of Barnard,* 1 B.R. 640 (Bankr.M.D.Fla.1979). Accordingly, what was intended by Mrs. Carmack and Tri–County at the time each note was executed controls on the issue of whether or not Collateral Agreement A and B secures these notes.

The testimony of the debtor is clear. Mrs. Carmack testified that she understood what a mortgage was and that the collateral note she was signing was a mortgage. Further, she understood that she would receive no money from the collateral note itself. Rather, future sums would be forthcoming for the various purposes outlined in the factual summary of this opinion. Mrs. Carmack knew enough to understand the nature of her liability for a deficiency if her land would not cover her debt should a default occur. While she may not

---

**4.** The Bankruptcy Court specifically refused an opportunity to make a finding as to the parties' intent because it was unnecessary to the holding of the Court. *Carmack,* 84 B.R. at 627.

have known the exact date of the collateral notes, she certainly knew the notes she executed were secured.

The testimony of Tri–County's representatives supports this conclusion. It is clear that the bank intended the various sums it advanced to Mrs. Carmack to be secured by the collateral notes executed between the parties. No other explanation of the transactions between the parties is logical.

In light of the above observations, it is clear the error in the collateral reference date in the promissory notes is a clerical error. "[clerical errors] do not defeat the intentions of the parties." *Miller v. Swanson*, 66 Ill.App.2d 179, 213 N.E.2d 294, 300 (1965). "Errors or inaccuracies in the description of the note secured by the mortgage will not invalidate the mortgage if the intention of the parties is apparent, or the intention of the parties can be otherwise identified." 59 C.J.S. *Mortgages* § 112(d) (1974 & Supp.1988).

While the Court's research reveals no controlling authority analogous to the case *sub judice*, reference to other jurisdictions' decisions in this area are persuasive. For example, in *E.E.E., Inc. v. Hanson*, 318 N.W.2d 101 (N.D.1982), the mortgage at issue stated it was secured by a note of February 4, 1980. The actual date of the note was December 23, 1979. The Court found the intent of the parties was to secure the December 23 note by the mortgage and the mortgagors could not escape this result because of an erroneous description of the obligation. *Id.* at 106–07.

In *Mortgage Assoc., Inc. v. Hendricks*, 51 Wis.2d 579, 187 N.W.2d 313 (1971), a similar result was reached. The mortgage at issue in *Hendricks* stated it was secured by a note of even date; such language meaning the date of execution of the note was the same as the date of execution of the mortgage. In reality, the mortgage was dated October 11, 1965, while the note allegedly secured by it was dated October 8, 1965. The court, finding the note to be secured, held "a mistake in reciting the date of the note will not in and of itself invalidate the mortgage if the note can be identified by other means." *Id.* 187 N.W. 2d at 316.

The above cases address the issue of an error in the mortgage's description of the note secured. The rationale is equally applicable to this case where the error is in a subsequent note's identification of a pre-existing collateral note. The Court will not disturb the intent of the parties by a literal reading of an obvious clerical error. The notes were secured by their respective collateral agreements at the time Mr. Renne made his unilateral alterations because that was the intent of the parties. As the notes were already secured, Mr. Renne's actions could not "transfer" any interest to the debtor's property to the bank. Without a transfer of an interest in the debtor's property, there can be no preference.

Much is made by the Bankruptcy Court and the appellee of the fact that Mr. Renne uniterally altered the reference dates on these notes. Irrespective of the Court's personal view of such activities, the actions do not change the previously mentioned result.

■ Any time a party to a contract makes a unilateral change to the agreement, an inquiry must be made as to the non-consenting party's rights and obligations under the modified agreement. The cases on point reveal the key inquiry is whether the alteration is "material". A material alteration will void the nonconsenting party's obligations under the agreement, while a nonmaterial alteration will not.

The case of *Bruegge v. State Bank of Wellston*, 74 S.W.d 835 (Mo.1934) sets the backdrop for this inquiry. Although the facts of *Bruegge* are complex, the case in its simplest form is strikingly similar to the case at bar. The basic issue in *Bruegge* was whether a bank's unilateral insertion of the execution dates of pre-existing collateral agreements in blanks on several notes constituted a material alteration so as to invalidate the notes or the deed of trust securing the notes. *Id.* at 840. Addressing this issue, the court stated:

[O]ne of the tests of whether an actual alteration is material is whether the in-

strument as altered would change the rights and obligations of the parties or leave them the same as the law would imply if no change had been made.... In accordance with these principles it has been held that an addition or change in an instrument is not a material alteration if it "serves merely to make the description of the property more definite or in accord with the obvious intention of the parties as imperfectly expressed therein."

*Id.* at 841 (citations omitted).

Applying the above principles, the *Bruegge* court found that it was always the intent of the parties to secure the note by the pre-existing deed of trust; "how could it be a material alteration to merely write in the blank spaces ... a description of trust deeds already in possession of the bank that the [plaintiffs] understood in some way or other [sic] was to account somehow as security for their indebtedness?" *Id.* The Court finds no discernible difference in the case at bar. *See also Shelton v. Julian,* 610 S.W.2d 129, 133 (Mo.Ct.App.1980) ("[I]t is well established that the making of a notation upon or an addition to an instrument does not constitute an alteration thereof, where there is no intent to change the effect of the instrument...."); *Diecke v. Roudebush,* 138 S.W.2d 678, 682 (Mo.Ct.App.1940) (crossing out loan amount on note and replacing it with new balance of note was not material alteration).

There is nothing in the record supporting a conclusion that it was the intent of the parties to execute unsecured notes. The bank's actions served merely to make the description of the property conform with the obvious intent of the parties as imperfectly expressed in the notes. The Bankruptcy Court erred in holding no valid mortgage existed to secure Notes 1, 2, 3, 4, 5 and 7 at the time of the alterations.

Although unnecessary to this decision, the undersigned must also disagree with the Bankruptcy Court's conclusion that the unilateral actions of Tri–County created a lien on the debtor's property. Even assuming, *arguendo,* that Tri–County was unsecured at the time of the changes, a mortgage cannot be created by a unilat-

eral act. Ignoring, for purposes of argument, the balance of the requirements for a valid mortgage, Tri–County would have had to at least obtain the debtor's consent. As the debtor testified, she did not consent to the alterations. Accordingly, no such activity by Tri–County could have created a lien on her property if none previously existed.

The preceding discussion reveals that neither premise necessary to find a preference is present in the case at bar. The Court believes the intent of the parties was to secure the notes by their respective collateral agreements and a clerical error will not defeat that intent. Mr. Renne simply altered the agreements to reflect—in the eyes of the law and the parties—their true meaning.

No error is alleged in the Bankruptcy Court's holding invalidating the financing statement covering the debtor's personal property and, accordingly, said holding is affirmed. The Bankruptcy Court is also affirmed as to its holding regarding Note 6. In all other respects, the lower court is reversed.

It is hereby

ORDERED that the Bankruptcy Court's order and judgment of March 21, 1988, is reversed and the cause is remanded for the purpose of reinstating the mortgages securing the notes at issue in this cause.